**STATE ex rel. TEL–CENTRAL OF JEFFERSON CITY, INC., Appellant/Relator,**

v.

**PUBLIC SERVICE COMMISSION OF MISSOURI, Respondent,**

**United Telephone of Missouri, Intervenor/Respondent.**

**No. WD 43397.**

Missouri Court of Appeals, Western District.

Feb. 5, 1991.

Motion for Rehearing and/or Transfer to Supreme Court Denied April 2, 1991.

Application to Transfer Denied May 3, 1991.

William M. Barvick, Jefferson City, for appellant.

Penny G. Baker, Jefferson City, for respondent.

W.R. England, III, Hawkins, Brydon, Swearengen & England, Jefferson City, for intervenor/respondent.

Before GAITAN, P.J., and TURNAGE and KENNEDY, JJ.

TURNAGE, Judge.

Tel–Central of Jefferson City, Inc. filed a complaint with the Public Service Commission of Missouri against United Telephone of Missouri after United had suspended telephone service to Tel–Central. The Commission found the issues in favor of United and dismissed the complaint. On appeal the circuit court affirmed. Tel–Central contends that the Commission's action was unlawful and unreasonable because there was no tariff authorizing suspension of service, because the notice of suspension was inadequate, and because there was no evidence to support a finding that Tel–Central had failed to carry its burden of proof that it was not indebted to United. Affirmed.

Tel–Central was authorized by the Commission to provide intrastate and interstate long distance telephone service. It purchases telephone service from United and resells telephone service to various customers. The dispute in this case arises over the Wide Area Telephone Service provided by United to Tel–Central for intrastate calls.

United charged Tel–Central for WATS services on a fixed monthly charge for each line supplied together with a variable charge determined by line usage. United billed Tel–Central monthly for both charges.

In March, 1986, Tel–Central received a series of special bills for past interstate and intrastate WATS service and later received additional special bills for interstate services. The total of the bills was $120,-771.86 with the intrastate portion being $35,899.35. The special bills were charges for services in August, 1984, and July through October, 1985. United said these bills were sent late because it had just received data revealing the unpaid amounts.

Following the receipt of the special bills Tel–Central disputed the fact that it owed United. For the next year United and Tel–Central communicated about the problem. At one point Tel–Central sent United a check for less than United claimed with a restrictive endorsement which stated that acceptance of the check constituted settlement in full for all money due United. United refused the check.

The matter came to a head on March 27, 1987, when United wrote Tel–Central demanding payment and informed Tel–Central that unless full payment of the bill was received within five days of the receipt of the letter WATS service would be suspended. After receipt of the letter Tel–Central wrote United restating its refusal to pay and again sent a check for less than United demanded with a restrictive endorsement. United again refused the check.

On April 7, 1987, United programmed its computer so that calls placed by Tel–Central customers received nothing but a dial tone, except they could dial 911. United

restored service to Tel–Central in June, 1987, after Tel–Central paid a part of the bill and provided a letter of credit. The filing of this complaint followed.

Tel–Central contends that United did not have a tariff which authorized it to suspend service to Tel–Central. Evidence before the Commission showed that in April, 1980, United filed a tariff with the Commission which concurred in and adopted the WATS tariff filed by Southwestern Bell as such tariff then existed or as it may be revised, added to or supplemented. The Bell tariff provided that upon nonpayment of any sum due, Bell could give notice in writing to the customer five days prior to the date of proposed discontinuance of service and could thereafter discontinue service. This tariff was filed in 1984.

The Commission found that United had concurred in the Bell tariff and under such tariff United was authorized to suspend service to Tel–Central for nonpayment of its bill upon the giving of five days notice. The Commission found that United had given Tel–Central five days written notice and was therefore authorized to discontinue service to Tel–Central.

Tel–Central argues that United did not have a tariff because the Commission is not authorized to allow one utility to concur in the tariff of another. Section 392.220.1, RSMo 1986, provides that every telephone corporation shall file with the Commission a schedule showing rates, rentals, and charges for service. That section further provides that the Commission shall have the power to prescribe the form of such schedule. The Commission has adopted 4 CSR 240–30.010(33), which prescribes the form to be used by a telephone corporation to concur in the schedule of another company.

■ The authority in § 392.220.1, to prescribe the form for a schedule or tariff, authorizes the Commission to allow one company to concur in the schedule or tariff of another. Rather than requiring a company to file the numerous pages in a tariff, it greatly simplifies the Commission's task for one schedule to be filed and allow those companies who desire to concur therein to file concurrences. Certainly nothing in the statutes prohibits concurrence and the statutory authority to prescribe the form of a schedule is sufficient to allow the Commission to permit concurrence and to prescribe the form for filing concurrences.

■ The principal argument Tel–Central advances against the use of concurrences is based on the holding in *State ex rel. Util. Consumers Council, Etc. v. P.S.C.,* 585 S.W.2d 41 (Mo. banc 1979). In that case the court held that a utility could not file a tariff with the Commission which contained an automatic fuel adjustment clause. The court held that the Commission must use the file and suspend method of rate making which requires the utility to file a tariff with proposed rates and the Commission to suspend such rates pending determination of whether to approve the same. Tel–Central argues that allowing a concurrence to be filed in a schedule or tariff and providing that the concurrence would apply to revised schedules to be filed in the future would be the same as an automatic fuel adjustment clause.

The flaw in this argument is that the Commission must approve the revised tariff so there is no change in a tariff which takes effect without Commission approval as there was in the automatic fuel adjustment clause. *State ex rel. City of St. Louis v. Public Service Comm'n,* 327 Mo. 318, 36 S.W.2d 947, 950(3) (1931). If the revised tariff is approved the concurrence will adopt the revision but if it is not approved, the concurrence does not accomplish any change.

Tel–Central concedes that United could provide by proper tariff for authority to discontinue service upon nonpayment of a bill. The same result has been reached when United concurred in the Bell tariff. The only difference is that United did not file as many sheets to accomplish the same result as Bell had filed to establish the tariff.

The Commission had authority to allow United to concur in the Bell tariff and therefore there was substantial evidence to support the finding that United had a tariff

authorizing the discontinuance of service to Tel–Central upon the nonpayment of its bill.

■ Tel–Central also contends that § 392.200.5, now § 392.200.6, RSMo (Supp. 1990), prohibits a telephone company from discontinuing service for nonpayment of a bill. That section provides:

Every telegraph corporation and telephone corporation operating in this state shall receive, transmit and deliver, without discrimination or delay, the conversations and messages of every other telegraph or telephone corporation with whose line a physical connection may have been made.

This court does not read that section as Tel–Central contends. It makes no mention of unpaid bills and certainly does not prohibit a telephone company from discontinuing service because of an unpaid bill. To hold otherwise would mean that a telephone company would be required to serve every customer so long as service was requested whether the customer paid the bill or not. This court refuses to attribute that meaning to the section absent express language to that effect.

■ Tel–Central next contends that the discontinuance of service was not lawful because an adequate notice of suspension was not given in writing to specify the telephone lines to be affected.

As noted, United gave written notice to Tel–Central that "your WATS service will be suspended" more than five days before Tel–Central's service was to be discontinued. This notice was sufficient to advise Tel–Central that all WATS service being provided by United was to be suspended. There was no need for the notice to specify the lines to be affected by number or other description when the notice clearly stated that all WATS lines would be affected. Tel–Central further contends there was no way to know whether the WATS lines in Jefferson City or Rolla, or both, would be discontinued. The notice was broad enough to cover both Jefferson City and Rolla and the fact that United chose to discontinue only the Jefferson City lines simply worked to the advantage of Tel–

Central. Absent a tariff which required a more precise notice, the notice given in this case satisfied the requirement of the applicable tariff.

■ Tel–Central finally contends that the Commission improperly imposed a burden on Tel–Central to prove United's affirmative defense to Tel–Central's complaint. In its complaint Tel–Central alleged that it had paid all of its bills to United and therefore the discontinuance of service was unauthorized. Having asserted the affirmative of the issue concerning the payment of its bills, the burden was upon Tel–Central to prove that it had paid all of its bills. *Michaelson v. Wolf,* 364 Mo. 356, 261 S.W.2d 918, 924[5] (1953) (burden of proof rests upon party shown by the pleadings to be asserting the affirmative of an issue). Essentially the defense of United was that the special bills were for service for which Tel–Central had not paid. Thus, having pleaded that it had paid all of its bills to United, the Commission properly held that the burden of proof on that issue rested with Tel–Central.

■ On the issue of the payment of Tel–Central's bill, United presented evidence of the nature and method by which United measured the service provided Tel–Central which determined the amount of the variable part of Tel–Central's bills. The evidence was that United measured actual minutes of usage of its lines by Tel–Central which was triggered by the party called answering the telephone. In contrast, Tel–Central's measurement was of billed minutes of use which were the minutes it billed to its customers. Tel–Central employed this measurement of usage because it did not have the technical capability to measure actual usage. The difference in the time measured by United and Tel–Central resulted from the fact that Tel–Central allowed 43 seconds to elapse from the time the last digit of a telephone number called was dialed because its device could not record when the telephone was answered. Tel–Central's device assumed that if the lines were still in use at the end of 43 seconds then the phone had been answered.

United's measuring device began measuring the time from 2 seconds after the called party answered the telephone because it could detect the answer. Thus, a call by a Tel–Central customer which was completed in less than 30 seconds would not show up on Tel–Central's measuring device at all. Further, the Tel–Central device did not measure the first moments of every call that was answered within 43 seconds of the completion of dialing.

Because of the difference in the measuring device used by United and that used by Tel–Central, Tel Central realized that there would be a difference between its records and United's regarding usage time. Tel–Central contended the industry had a standard which calculated such difference to be 20%. Tel–Central therefore contends that it should not be found to have incurred more usage time than shown by its measuring device plus 20%. It contends it paid United a sum for line usage that brought it within the industry tolerance.

United presented detailed evidence of Tel–Central's usage and Tel–Central presented records of a similar nature. From the evidence presented by United the Commission could have found that the amount claimed by United to be unpaid was in fact unpaid and that United had not billed Tel–Central twice for the same usage. This was substantial and competent evidence which the Commission chose to believe and supports its finding that Tel–Central failed to carry its burden to show that it did not owe United any money at the time its service was discontinued. Nor was the Commission bound to accept Tel–Central's contention that it could not be held to owe for any more service than 20% above the usage shown by its measuring device.

The order and report of the Commission is supported by substantial and competent evidence and is not shown to be unlawful. The judgment affirming the decision of the Commission is affirmed.

All concur.